UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MISTY MARIE LOPEZ,

          Plaintiff,

    v.

NANCY A. BERRYHILL,

          Defendant.

Case No.17-cv-02100-JSC

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 17

      Plaintiff Misty Marie Lopez ("Plaintiff") seeks social security benefits for a combination of mental and physical impairments, including: bipolar disorder; bulging discs in neck; protruding disc in lower back; depression; anxiety; arthritis in lower spine; thyroid cancer of potentially stage three; and fibromyalgia. (Administrative Record ("AR") 95.) Pursuant to 42 U.S.C. § 405(g), Plaintiff filed this lawsuit for judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying her benefits claim. Now before the Court are Plaintiff's and Defendant's Cross-Motions for Summary Judgment.[1] (Dkt. Nos. 14 & 17.) Because the Administrative Law Judge ("ALJ") improperly weighed the medical opinions and erred in his credibility determination as to both Plaintiff's testimony and lay statements, the Court GRANTS Plaintiff's motion, DENIES Defendant's cross-motion, and REMANDS for the award of benefits.

## LEGAL STANDARD

      A claimant is considered "disabled" under the Social Security Act if she meets two requirements. *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 3, 9.)

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment or impairments must be severe enough that she is unable to do her previous work and cannot, based on her age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). To determine whether a claimant is disabled, an ALJ is required to employ a five-step sequential analysis, examining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

In August 2012, Plaintiff filed an application for Social Security Disability Insurance Benefits ("benefits") under Title II of the Social Security Act. (Administrative Record ("AR") 268.) Her application alleged disability with an onset of April 20, 2011 resulting from the following conditions: bipolar disorder; bulging discs in neck; protruding disc in lower back; depression; anxiety; arthritis in lower spine; thyroid cancer of potentially stage three; and fibromyalgia. (AR 95.) Plaintiff's application was denied as was her request for reconsideration and she requested a hearing before an ALJ. (AR 126, 131-32, 140.) At the first ALJ hearing, Plaintiff testified as well as vocational expert ("VE") Timothy Farrell. (AR 50-80, Transcript of January 22, 2015 hearing.) Plaintiff then underwent additional medical and psychological examinations. (AR 703-24.) At the supplemental ALJ hearing, Plaintiff testified again as did VE Abby May. (AR 80-93, Transcript of July 30, 2015 hearing.) The ALJ issued Plaintiff an unfavorable decision on August 13, 2015. (AR 25-39.)

## ADMINISTRATIVE RECORD

Plaintiff was born on March 15, 1979. (AR 268.) She has suffered from various physical

and mental health ailments including thyroid cancer, spine disorders, and affective disorders. (AR 100.) Plaintiff obtained her high school diploma and completed a year of college (AR 314.) She resides with her spouse and her four children in Contra Costa County. (Dkt. No. 2.) Since 1998 she has worked as a hostess; Certified Nursing Assistant; Heavy Machine Operator; Computer Technician; Data Entry Clerk; and most recently as an auction block clerk from 2009 through 2011. (AR 107, 314.) Plaintiff resigned from that position—following a diagnosis of thyroid cancer—because she was concerned about the high levels of secondhand tobacco smoke in the work environment. (AR 58.) Plaintiff alleges that her physical and mental health conditions limit her functioning such that she is unable to work and often relies on family for help with activities of daily living. (AR 58-73.)

## I. Medical Evidence

Plaintiff has seen a variety of physicians as a result of her medical conditions. A discussion of the relevant medical evidence follows.

### A. Medical and Psychiatric History

Plaintiff has a history of low back pain. She was involved in a motor vehicle accident in 1999 while nine months pregnant that caused back and neck pain. (AR 61, 473, 649.) In March 2007, after suffering lower back pain for approximately seven years, Plaintiff underwent a spinal MRI that revealed posterior disc bulge at her L5-S1 disc and bilateral facet joint arthritis of the same. (AR 619.) In December 2008, Plaintiff underwent a second spinal MRI which showed the L5-S1 disc bulge had reached a nerve root. (AR 620.) Her cervical spine showed a loss of lordosis (curvature) and disc bulges at C5-6 and C6-7, but "no acute abnormality" was found. (AR 620, 623, 625.) In 2011, Plaintiff underwent a successful "Lap-Band" procedure to resolve morbid obesity following which she lost 70 pounds. (AR 439, 637.)

Plaintiff also has a history of cancer. In April 2011, she was diagnosed with thyroid carcinoma for which she underwent radiation therapy, radical right neck dissection, and a total thyroidectomy. (AR 400-05.) Plaintiff underwent radiation therapy in June 2011 and July 2012. (AR 494.) Between 2011 and 2013 her doctors monitored a liver lesion which ultimately stabilized. (AR 648-54.) On account of concern for her liver, Plaintiff ceased taking psychiatric

3

medications for her bipolar disorder.  (AR 651, 659, 752.)  Although the radiation and surgery seems to have taken care of the cancer, Plaintiff has reported depression; burning pain in her neck, shoulders, and back; as well as "constant" migraines and nausea.  (AR 651.)

As set forth in more detail below, Plaintiff also has a history of mental illness and in 2011, she was diagnosed with bipolar and depressive disorders.  (*See, e.g.*, AR 442, 473, 688-90, 752.)

**B.     Medical Evaluations**

In connection with her application for benefits, Plaintiff underwent a variety of physical examinations.  These evaluations are summarized below.

### *2. Examining Physician Dr. Ali*

That same month, Plaintiff was examined by state Agency physician Dr. Ali.  (AR 444-47.)  Dr. Ali found Plaintiff had a limited cervical range of motion, limited motion in her right shoulder, some paravertebral muscle spasms and some crepitus in her knee. (AR 446-7.)  Dr. Ali limited Plaintiff to a maximum lifting/carrying capacity of 20 pounds occasionally and 10 pounds frequently, and limited her use of her right arm to reach.  (AR 447.)  Dr. Ali found no limitations in Plaintiff's maximum standing/walking or sitting capacity but limited her to only occasional "postural activities."  (*Id*.)

### *4. Examining Internist Dr. Keystone*

In November 2012, Dr. Keystone examined Plaintiff at the request of the Agency.  (AR 473-78.)  Plaintiff cried intermittently throughout the exam and could not recall her exact age but did correctly recite her date of birth.  (AR 475.)  Dr. Keystone opined that Plaintiff had decreased sensation in her cervical spine at the C5-C6 and C3-C4 areas as well as in her legs and thighs.  (AR 477.)  Dr. Keystone further noted that Plaintiff had: (1) reduced grip strength in her right hand; (2) a positive straight leg test on her right side; (3) and a decreased range of motion in her neck.  (AR 476.)  Dr. Keystone found that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand up to two hours per day with occasional "postural activities."  (AR 477.)  All other medical findings were unexceptional.  (AR 473-78.)

### *5. Examining Neurologist Dr. Glantz*

In November 2015, Dr. Glantz, a neurologist, examined Plaintiff at the request of the

Agency.  (AR 703-15.)  Plaintiff described a diagnosis of fibromyalgia and total body pain, including numbness in all 10 fingers and, as recorded by Dr. Glantz, recent-onset foot numbness and bilateral arm pain.  (AR 711.)  Dr. Glantz opined that Plaintiff was able to lift and carry 50 pounds occasionally and 25 pounds frequently as her straight leg test did not change the level of low back pain.  (AR 715.)  Plaintiff was also found to be able to engage in frequent postural activities, manipulative activities, and had no limitations on sitting/standing.  (*Id*.)  Dr. Glantz found no indica of fibromyalgia but diagnosed it by Plaintiff's stated history.

### C.  Psychiatric Evaluations

In connection with her application for benefits, Plaintiff underwent a variety of mental health examinations.  These evaluations are summarized below.

#### 1. Treating Psychiatrist Dr. Ferrer

Plaintiff was under the care of treating psychiatrist Dr. Ferrer from October 2011 until June 2013.  (AR 752.)  Dr. Ferrer provided an opinion in October 2012 stating Plaintiff had a poor ability in the following areas: (1) recalling detailed/complex instructions; (2) attending tasks and concentrating; (3) interacting with the public; and (4) adapting to changes in the workplace.  (AR 449-50.)  Dr. Ferrer found Plaintiff had fair ability in some areas: (1) following short/simple instructions; (2) carrying out instructions; (3) working without supervision; (4) interacting with coworkers; (5) interacting with supervisors; (6) remaining aware of hazards and reacting appropriately; and (7) being able to use public transportation or travel to unfamiliar places.  (*Id*.) In addition, Dr. Ferrer authored an October 2015 letter opining that Plaintiff suffers from bipolar disorder (Type II depressed) and that she was unable to work during her time in his care because of mood instability.  He recommended that she resume psychiatric care.  (AR 752.)

#### 2. Examining Psychologist Dr. Renfro

In July 2011, Dr. Renfro, a psychologist, examined Plaintiff at the request of the Agency.  (AR 439-43.)  Dr. Renfro diagnosed Plaintiff with depressive order due to a medical condition.  (AR 442.)  In Dr. Renfro's view, Plaintiff was mildly impaired in her "ability to do detailed and complex instructions."  (*Id*.)  She was mildly impaired in her ability to relate to and interact with coworkers and the public, and to perform work activities consistently at the proper pace.  (*Id*.)

United States District Court
Northern District of California

Plaintiff was not impaired in her ability to attend to work activities including attendance and safety. (*Id.*) She was able to understand and carry out simple work instructions including taking direction from supervisors, and could perform "routine, non-stressful" work activities without special supervision. (*Id.*)

### 3. Nonexamining Agency Psychologist Dr. Shadid

In October 2012, Dr. Shadid, a nonexamining psychological consultant for the Agency, opined that Dr. Ferrer's medical source statement seemed "more restrictive than the claimant's ADL." (AR 101.) Dr. Shadid found Plaintiff "partially credible" based on her activities of daily living, as Plaintiff can "drive and go out alone, and shop for up to two hours." (AR 101-02.) Dr. Shadid also noted that Dr. Ferrer's medical source statement did not contain "specific limitations to functioning." (AR 101.) Dr. Shadid also completed the mental RFC assessment. (AR 104-06.)

### 4. Nonexamining Agency Psychologist Dr. Caruso-Radin

In October 2013, Dr. Caruso-Radin, a nonexamining psychological consultant for the Agency, reviewed Plaintiff's Agency file pursuant to her reconsideration request.[2] (AR 35, 115-16, 120-22, 131.) Dr. Caruso-Radin's opinion consisted of the following: "Sum: alleging bipolar. DLI 6/30/13. Thus current Y CE is not reasonable. Reviewing the records from the period in question, it appears the bipolar is kept stable and MSE's are good. The evidence as a whole indicates the prior decision remains reasonable and based in the MER. Prior decision is adopted." (AR 115-6.) Dr. Caruso-Radin also completed the mental RFC assessment. (AR 120-22.)

### 5. Examining Psychologist Dr. McCord

In April 2015, Dr. McCord, a neurologist, examined Plaintiff at the request of the Agency. (AR 717-24.) Plaintiff presented as crying and irritable. (AR 717.) Dr. McCord opined that Plaintiff showed no impairment in her ability to understand and carry out simple instructions and tasks. (AR 720.) Plaintiff was found to have mild impairment in her ability to attend to usual work situations including attendance and safety. (*Id.*) Further, Plaintiff was found moderately

---

[2] The ALJ's opinion provides that Dr. Caruso-Radin's review took place on October 2, 2012 when it in fact was completed on October 2 the following year.

impaired in her concentration, pace, and persistence. (*Id.*) She was moderately-to-severely impaired in her ability to interact appropriately with supervisors, co-workers, peers, and the public. (*Id.*) Dr. McCord observed Plaintiff to be "somewhat paralyzed by depression" during the examination, although he noted that she was able to "warm up and use more energy." (AR 719.) Dr. McCord's notes indicate that Plaintiff is able to get along with people and supervisors "as long as fatigue does not set in," but also that she would likely need constant reminders to recall verbally-delivered details. (AR 722.)

### D. Other Evidence

In connection with these proceedings, several members of Plaintiff's family submitted letters in support of her disability claim. These letters are summarized in relevant part below.

#### 1. Husband Jason Lopez

Jason Lopez, Plaintiff's husband, wrote a letter on Plaintiff's behalf in December 2014, prior to the first ALJ hearing. (AR 368-69.) Mr. Lopez stated that prior to her cancer diagnosis and thyroidectomy, Plaintiff was energetic and independent whereas after that treatment she tires quickly and suffers from a poor memory such that she sets daily alarms even to take medications. (AR 368.) Mr. Lopez noted that Plaintiff's neck and back pain "make it near [sic] impossible for her to sweep the floor or vacuum as these activities increase her pain....she has to ask others for help, from cleaning to carrying the laundry baskets up or downstairs." (*Id.*) He also stated that Plaintiff's neck and back issues cause her to need to "shift her position every 15-20 minutes" when sitting; that walking "causes her pain as well"; and that she experiences migraines. (*Id.*) Mr. Lopez corroborated Plaintiff's general statements that since her second round of radiation treatment she has suffered from a number of digestive issues. (*Id.*; *see* AR 68-69, 393-94.) Mr. Lopez wrote also that Plaintiff suffers from anxiety in public and angers easily. (AR 369.)

#### 2. Son Jesse Lopez

Jesse Lopez is one of Plaintiff's sons with whom she lives. (AR 62.) He also wrote a letter on Plaintiff's behalf. (AR 360-69.) Jesse stated that Plaintiff's neck and back conditions predate even the April 2011 thyroidectomy and radical neck dissection, but that these conditions became "exponentially worse" after that procedure. (AR 360.) Jesse recalled incidents where,

7

due to muscle spasms, he had discovered his mother lying on the floor. (*Id.*) One such incident occurred after Plaintiff tried to "pick up some laundry and got stuck because her back hurt so bad." (*Id.*) Unable to stand, Plaintiff called out for Jesse for help to "get off the floor and into bed." (*Id.*) On another occasion, Jesse came home from work and found Plaintiff sprawled out on the kitchen floor as she had a back "spasm" when attempting to put away groceries and there was nobody to help Plaintiff until he arrived. (*Id.*) Jesse indicated that Plaintiff "can't even carry a basket of laundry to her room if it's a full load. Some days even just a few errands will make her come home and pass out for the rest of the day." (AR 364.) In addition, Jesse described Plaintiff's recurrent bouts vomiting that have followed in the "three years since her last round [of radiation treatment]" such that he sees Plaintiff's "mad dash[es]" to the bathroom where she vomits upon eating a meal. (AR 363.)

Jesse also described Plaintiff's mental health issues indicting that Plaintiff suffers from bipolar "lows" that are more severe than ever since the thyroidectomy in 2011 such that when "low" Plaintiff: "drops off the radar for about a week"; "sleeps all day for days at a time"; and "doesn't cook or clean for herself." (AR 365.) In contrast, when amidst a bipolar "high," Plaintiff once stayed up "for a week straight" and Jesse has seen her in the kitchen cooking for eleven hours at a time and otherwise "running about doing housework." (AR 366.) At such times Plaintiff is irritable and quick to argue and in general suffers from a reduced short-term memory, forgetting conversations held the same day. (*Id.*)

### 3. Daughter Brittney Lopez

Brittney Lopez is one of Plaintiff's daughters with whom she lives. (AR 62.) She also wrote a letter on Plaintiff's behalf. (AR 372-73.) Brittney stated that Plaintiff suffers from severe pain such that she "can't walk around for long" because it causes "an extreme amount of pain." (AR 372.) In addition, Brittney noted that Plaintiff suffers from bouts of vomiting and "constant" migraines. (*Id.*) Because of her back pain, Plaintiff has difficulty "stand[ing] and clean[ing] around the house." (*Id.*) Brittney "has seen [Plaintiff] in so much pain she cries." (*Id.*) More generally, Plaintiff suffers from "really big mood swings." (AR 373.)

//

8

### 4. Letter by Plaintiff

On October 19, 2015, Plaintiff submitted a letter as proof of her disability. (AR 393-94.) Plaintiff stated that since her second round of radiation treatment in 2012, she continues to experience recurrent bouts of nausea and vomiting as well as digestive problems. (AR 393.) Plaintiff also stated that the numbness and pain in her right arm and shoulder are often debilitating and cause her to drops things held in her right hand, as well as impairing her ability to sleep. (*Id*.) Plaintiff states that she struggles to complete everyday household tasks—such as carrying laundry, vacuuming, sweeping, and mopping—without assistance. (AR 394.) She further stated that postoperative pain medications she took caused migraines or other complications, and that she continues to feel that the use of prescription pain medications is inappropriate in light of the children present in her household. (*Id*.) And since her 2011 thyroidectomy, Plaintiff provided that she cannot tolerate noise, concentrate even during conversation, or shop for groceries without "falling apart." She also reports suffering from severe panic attacks and limited short-term memory such that she constantly forgets things. (*Id*.)

## II.    ALJ Hearings

### A.    January 2015 ALJ Hearing

#### 1. Physical Health Conditions

At the first administrative hearing Plaintiff appeared with counsel and testified to her alleged physical impairments that precluded her from working. Plaintiff suffers neck and back pain that prevents her from standing, walking, or sitting for long periods of time "without a great deal of pain." (AR 58-59.) Sitting for long periods of time causes Plaintiff's neck and back to "hurt really bad." (*Id*.) And Plaintiff is "really not even able to carry a laundry basket that's full of clothes" unless she receives assistance. (AR 59.) Plaintiff can load the dishwasher but only sometimes unload it when the bottom drawer does not get stuck, but in either event "it's hard." (*Id*.) And after she sweeps and vacuums around the house she is "down for two days with back pain" afterwards. (*Id*.) Plaintiff cannot stand more than 10 minutes in the same position before "[her] back starts to get bad, and [she] starts to shift, and then [she has to] squat to stretch [her] back out" and ultimately must sit and rest. (AR 60.) But she can walk slowly for "about a mile"

over flat terrain.  (*Id.*)  Plaintiff she can lift "maybe 20 pounds maybe once" if setting the object down immediately.  (AR 60.)  But while she can hold 10 pounds for "up to half an hour," she experiences an "excruciating amount of pain" thereafter.  (AR 61.)  One of Plaintiff's daughters does most of the cooking and while Plaintiff bathes and dresses herself, she struggles to brush her hair at times because of the pain in her back and neck.  (AR 63.)  And because of the radical dissection performed on her Plaintiff's neck in 2011, the muscle and tissue in her neck is numb so she tries not to carry or hold things on her right side as it "pulls on the throat."  (AR 65.)  Plaintiff further explained that the scar gets tight and prevents her head from turning left, and her neck locks up, causing more pain.  (*Id.*)  Lastly, Plaintiff does not use controlled pain medications because she lives with her four children, one of whom was at-risk for self-injurious behavior.  (AR 61.)  She does go to a chiropractor and previously had trigger point injections in her shoulders which did not help.  (AR 61-62.)

### 2. Mental Health Conditions

Plaintiff also testified as to her mental health conditions.  (AR 65-73.)  Because of her bipolar depression Plaintiff has "more days than not that [she is] not really able to function" during which all she does is sleep.  (AR 66-67.)  Prior to her total thyroidectomy in 2011, Plaintiff experienced bipolar "highs" which have since become less frequent.  (AR 68.)  Plaintiff also suffers from: migraines two to three times each month; bowel incontinence about once a month and previously vomiting several times per week; feelings of being overwhelmed when around others that produces anxiety attacks; and impaired short term memory.  (AR 68-72.)  She does not bathe regularly when symptomatic.  (AR 70-71.)  In addition, everyday activities such as grocery shopping leave Plaintiff so exhausted that she naps afterwards.  (AR 73.)

### 3. VE Timothy Farrell

VE Farrell classified Plaintiff's past work as Data Entry Clerk (DOT 203.582-054) and Receptionist (DOT 237.367-038).  (AR 74.)  Plaintiff's work as an auction block clerk was classified under Systems Support Technician, combining both Scheduler (DOT 221.167-018) and Computer Operator (DOT 213.362-010).  (*Id.*)  Plaintiff's machine operator work was classified as Machine Press Operator (DOT 590.665-014).  (*Id.*)

The ALJ then posed to the VE several hypotheticals to determine whether there were jobs existing in significant numbers in the national economy that could be performed by an individual resembling Plaintiff. (AR 74-79.) The ALJ began with a hypothetical considering an individual with Plaintiff's age, education, and work experience, along with the following characteristics:

> Can perform medium work. She can perform work that is occasionally postural. She can perform simple tasks with routine supervision. She can relate to supervisors and peers on a superficial work basis. She cannot relate to the general public at work. The work performed must be unskilled.

(AR 74-75, Hypothetical 1.) The VE responded that this individual could perform one of Plaintiff's prior occupations—Press Machine Operator (DOT 590.665-014). (AR 75.) The ALJ modified the hypothetical as follows:

> Can perform light work. She is unable to frequently reach with the right upper extremity. She has the same mental limitations.

(AR 75-76, Hypothetical 2.) The VE responded that because all Plaintiff's past occupations were semiskilled or skilled, if limited to short and simple instructions Plaintiff would no longer meet the mental residual functioning capacity ("RFC") requirements. (AR 75.) The VE was asked about and suggested three examples of jobs available in general economy that would fit those criteria: (1) Assembler (DOT 706.684-022); (2) Bonding Machine Operator (DOT 690.685-154); and (3) Cleaner/Housekeeper (DOT 323.687-014). (AR 76.) The ALJ again modified the hypothetical:

> Can perform sedentary work. She can perform unskilled work. She can perform work that is occasionally postural. She is unable to reach frequently with the right upper extremity. She has the same mental limitations.

(AR 76-77, Hypothetical 3.) The VE was asked about and suggested three examples of jobs available in the general economy that would fit those criteria: (1) Assembler (DOT 734-687-018); (2) Inspector/Sorter/Tester (DOT 737.687-026); and (3) Assembler of Optical Goods (DOT 713-687-018.) (AR 77.) The VE prefaced his response by noting that the availability of those positions is "somewhat limited by the nature of their being sedentary." (*Id.*) The ALJ modified the hypothetical as follows:

> Cannot consistently work an eight hour workday. She cannot consistently work a 40 hour work week.

(AR 77, Hypothetical 4.) The VE testified that there are not sufficiently available jobs under the relevant regulations. (*Id.*) The ALJ asked the VE whether a person who would miss two to three days of work per month on a regular basis would be able to maintain employment in the general economy. (AR 77-78.) He replied in the negative. (*Id.*) Next, the ALJ then asked the VE whether a person with psychiatric issues resulting in routine unannounced work departures was employable in jobs requiring unskilled work. (AR 78.) The VE responded in the negative. (*Id.*)

At the ALJ's request, in April 2015 Plaintiff was examined by psychologist Dr. McCord as well as neurologist Dr. Glantz. (AR 717-24; 703-15.) Their findings were provided to Plaintiff, who responded by seeking a favorable decision or a second hearing, also filing an additional brief prior to the July 2015 hearing. (AR 384, 386-88.)

**B.     July 2015 ALJ Hearing**

At the supplemental hearing held before the ALJ on July 30, 2015, Plaintiff appeared with counsel and offered testimony regarding the examinations conducted by Drs. McCord and Glantz, to whom she was referred by the ALJ. (AR 83-84.)

As to her physical condition, Plaintiff also testified that since the January 2015 hearing she had begun experiencing numbness in her legs and an inability to grasp objects in her right hand such that Plaintiff's youngest daughter had begun brushing Plaintiff's hair. (*Id.*) She further reported that she had begun to experience recurrent bouts of inexplicable anger since the January 2015 hearing, causing her to yell frequently at her family. (AR 87.)

*3. VE Abby May*

Plaintiff's counsel examined the VE, Abby May, using the work limitations stipulated by Dr. McCord in his examining report. (*Id.*) The ALJ limited the use of hypotheticals in that examination to unskilled work generally, and to only psychological modifiers. (AR 89.) Counsel began with a hypothetical informed by the opinion of Dr. McCord:

> She has a mild impairment in understanding and carrying out simple instructions. She has a moderate impairment in the following areas: (1) understanding and recalling complex instructions; and (2) making judgments in complex work-related decisions. She has a moderate impairment in her ability to interact with (3) the public; (4) coworkers; and (5) supervisors. She has a marked impairment in her

ability to respond appropriately to (6) usual work situations and (7) changes in routine work setting.

(AR 89-90, Hypothetical 5.)  The VE was asked whether such an individual could be employed.

(AR 90.)  The VE replied that since the only "marked limitation" concerned workplace changes, then a workplace without many changes wouldn't produce a marked limitation.[3]  (AR 90.)  Since simple work is rarely complex; does not require public contact; and can be isolated with only limited exposure to supervisors and coworkers; the VE concluded that this individual would be precluded from a "great deal of work, but not necessarily all of it."  (*Id.*)  Counsel modified the hypothetical for VE as follows:  "She requires constant reminders to complete her assigned job duties."  (AR 91, Hypothetical 6.)  The VE testified that "nobody is going to be assigned [a] special person to remind them" so an individual who "can't remember simple, routine job duties...would not be able to perform work."  (*Id.*)  Counsel next introduced a hypothetical based on the findings of Plaintiff's treating psychiatrist, Dr. Ferrer:

> She has a poor ability to follow detailed and complex instructions. She has a poor ability to attend and concentrate.  She has a poor ability to interact with the public.  She has a poor ability to adapt to workplace changes.

(AR 91-92, Hypothetical 7.)  The VE testified that an individual suffering from those limitations would not be employable.  (AR 92.)

### III.    The ALJ's Findings

In a 15-page written decision issued on August 13, 2015, ALJ Phillip E. Callis found Plaintiff not disabled under sections 216(i) and 223(d) of the Social Security Act.  (AR 39.)  The ALJ considered the testimony offered at the January and July 2015 hearings and applied the Social Security Administration's five-step sequential evaluation process for determining disability.  (AR 26-39); 20 C.F.R. § 404.1520(a).

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity since the alleged onset date of April 20, 2011.  (AR 27); 20 C.F.R. § 404.1571 *et seq*.

At step two, the ALJ found that the objective medical evidence indicated that Plaintiff's (1)

---

[3] The VE did not specifically respond to "(6) marked limitation [in] responding to usual work situations."  And Plaintiff's counsel did not specifically follow up.

depressive disorder due to a medical condition; (2) thyroidectomy secondary to carcinoma of thyroid, status post iodine ablation; (3) cervical osteoarthritis with radiculopathy on the right; (4) lumbar disc pain in the L4-L5 area, each constituted "severe impairments" within the meaning of the regulations. (AR 27); 20 C.F.R. §§ 404.1520(c), 404.1521. The ALJ noted that Plaintiff's alleged fibromyalgia was not supported by medical records during the relevant period as examining neurologist Dr. Glantz found no trigger points during Plaintiff's April 2015 exam. (AR 28.) Finding no other medical evidence in the record to support a diagnosis of fibromyalgia, the ALJ concluded that if present, the condition is non-severe. (*Id.*)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination thereof that met or medically-equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 28.) The ALJ stated that he had evaluated Plaintiff for Sections 1.04 (disorders of the spine); 13.09 (thyroid gland); and 12.04 (depressive, bipolar and related disorders). (*Id.*) He next evaluated Plaintiff's mental impairment under paragraphs (B) and (C). (*Id.*) Under paragraph (B), the ALJ concluded Plaintiff's mental impairment did not satisfy the requirements because it did not cause (1) at least two "marked" limitations, where a marked limitation means more than moderate but less than extreme; or (2) repeated episodes of decompensation of extended duration, where extended duration means three episodes within one year, or an average of once every four months and lasting at least two weeks. (*Id.*) The ALJ found that Plaintiff had only "moderate" limitations in activities of daily living, social functioning, and in maintaining "concentration, persistence, or pace," and no extended episodes of decompensation. (AR 28-29.) Under paragraph (C), the ALJ concluded Plaintiff's mental impairment did not satisfy the requirements because it did not cause either (1) repeated episodes of decompensation, which is a residual disease process; or (2) an inability to function outside of a highly supportive living arrangement. (AR 29.)

The ALJ then found that Plaintiff had the Residual Function Capacity ("RFC") to perform medium work, except that: (1) "she can perform simple tasks with routine supervision"; (2) "can relate to supervisors and peers on a superficial basis"; and (3) "can have no public contact." (*Id.*); 20 C.F.R. § 404.1567(c).

To determine the RFC as to Plaintiff's physical impairments, the ALJ gave "great weight" to the opinions of Agency medical examiners Dr. Baldwin (AR 95-108) and Dr. Battis (AR 109-124), finding they were the "most consistent with the overall evidence of record, which indicates that [Plaintiff] has not had a recurrence of her thyroid cancer and has not received much treatment for neck and back pain through the date last insured." (AR 34.)

In contrast, the ALJ gave "some weight" to examining physicians Dr. Ali (AR 444-47) and Dr. Keystone (AR 473-78). (AR 34.) The ALJ gave "no weight" to the opinion of Dr. Glantz as he examined Plaintiff more than one year after the date last insured; however, the ALJ noted that Dr. Glantz' finding of no limitation on standing/walking/sitting and a lifting/carrying capacity of 50 pounds occasionally and 25 pounds frequently bore a close resemblance to the opinions of Agency examiners. (AR 34, 705-15.)

To determine the RFC as to Plaintiff's mental impairments, the ALJ gave "great weight" to the opinion of nonexamining Agency consultants Dr. Shadid (AR 104-06) and Dr. Caruso-Radin (AR 120-22). (AR 35.) The ALJ gave "some weight" to the opinion of examining psychologist Dr. Renfro (AR 439-43) because his opinion is "generally supported" by (1) his mental status examination findings and by (2) the opinions of the nonexamining Agency consultants. (AR 35.)

In contrast, the ALJ gave "little weight" to the opinion of treating psychiatrist Dr. Ferrer. (AR 36, 449-70.) The ALJ gave no "significant weight" to the April 2015 opinion of examining psychologist Dr. McCord because he examined Plaintiff nearly two years after the date last insured and "[did] not appear to have reviewed [Plaintiff's] treatment records." (AR 36, 717-24.)

In determining the RFC, the ALJ also concluded that Plaintiff's subjective allegations and testimony were only "partially credible" because (1) the record contained "significant inconsistencies" regarding Plaintiff's ability to stand, walk, or sit for long periods of time, and to do laundry; and (2) there are "limited physical examination findings and no evidence of significant treatment for these conditions" during the insured period. (AR 36-37.)

Likewise, the ALJ concluded the letters from Plaintiff's spouse and family were "not fully credible" in that they "generally mirror" Plaintiff's subjective complaints and were "unsupported by the preponderance of medical record evidence." (AR 37, 360-73.)

United States District Court
Northern District of California

At step four, the ALJ found that Plaintiff was capable of performing past relevant work as a Machine Press Operator based on the testimony of VE Farrell.  (AR 37, 74-75, Hypothetical 1.)  Considering recentness, duration, and earnings level, the ALJ determined that "Press Machine Operator" qualified as past relevant work available in the national economy and consistent with Plaintiff's medium work RFC.  (AR 37, 57, 304-07, 314, 321, 325.)

The ALJ thus reached step five as an alternative holding.  (AR 37.)  The ALJ determined that given her age, education, and work experience, Plaintiff could successfully adjust to other work existing in significant numbers in the national economy "even if she were limited to light or sedentary work."  (AR 37-38); 20 C.F.R. §§ 404.1569, 404.1569(a).  Under the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that—consistent with her RFC and VE Farrell's testimony—Plaintiff can perform representative jobs requiring light work.[4]  (AR 38, 75-76, Hypothetical 2.)  The ALJ then found that Plaintiff can perform representative jobs requiring only sedentary work.[5]  (AR 38, 76-77, Hypothetical 3.)  The ALJ concluded that Plaintiff was not disabled at step five because she  can adjust to other work existing in significant numbers in the national economy as set forth in VE Farrell's testimony, that Plaintiff is not disabled within the meaning of step five.  (AR 39.)  In sum, the ALJ determined that Plaintiff was not disabled during the insured period within the meaning of the Social Security Act.  (*Id.*); 20 C.F.R. § 404.1520(f).

## IV.    Appeals Council

Plaintiff filed a request for review of the ALJ's decision in August 2015 in which she maintained that the ALJ's determination was not supported by substantial record evidence as required by 20 C.F.R. § 404.970(a)(3).  (AR 20.)

The Commission incorporated into the record several of Plaintiff's additional exhibits.

---

[4] VE Farrell identified light-work jobs: (1) Assembler (DOT 706.684-022); (2) Bonding Machine Operator (DOT 690.685-154); and (3) Cleaner/Housekeeper (DOT 323.687-014).  (AR 75-76).

[5] VE Farrell identified sedentary-work jobs: (1) Assembler (DOT 734-687-018); (2) Check Weigher (DOT 737.687-026); (3) Final Assembler, Optical Goods (DOT 713-687-018.)  (AR 76-77.)  VE Farrell also opined that these positions' availability was "somewhat limited by the nature of their being sedentary."  (AR 77.)

(AR 5.) Accepted exhibits include: (1) a letter by Plaintiff describing the effect of her impairments on activities of daily living (AR 393-94); (2) records from Heather Rosenberg, Doctor of Chiropractic, dated May 2007 through June 2012 (725-51); and (3) an October 2015 letter from Dr. Ferrer (752). The Commission rejected two exhibits submitted by Plaintiff. (AR 2.) Rejected exhibits include: (1) Duplicative treatment records (AR 687-702), and (2) an October 2015 letter from Sidharth Sharma regarding a time period after the date of last insured.

On February 13, 2017, the Appeals Council upheld the ALJ's finding of nondisability. (AR 1-3.) Plaintiff then brought this action for judicial review under 42 U.S.C. §§ 405(g) and 1383(c)(3). (Dkt. No. 1, Complaint.)

## DISCUSSION

Plaintiff challenges three aspects of the ALJ's decision. First, Plaintiff maintains that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting the opinions of her treating and examining doctors and favoring the opinions of nonexamining Agency doctors. Second, Plaintiff contends that the ALJ incorrectly evaluated Plaintiff's credibility. Third, Plaintiff insists that the ALJ failed to offer germane reasons supported by substantial evidence for rejecting lay statements. The Court first considers the ALJ's evaluation of the medical opinions, then turns to Plaintiff's testimony and the lay statements, and lastly considers the questions of harmless error and remedy.

## I.    The ALJ's Evaluation of Medical Opinion Evidence

### A.    Legal Standard

Courts must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (as amended (Apr. 9, 1996)). "A treating physician's opinion is entitled to more weight than that of an examining physician, and an examining physician's opinion is entitled to more weight than that of a nonexamining physician." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). If a treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*,

923 F.2d 1391, 1396 (9th Cir. 1991). And "even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester*, 81 F.3d at 830 (internal citations omitted). Likewise, "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id*. at 830-31.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). Ultimately, "the ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

"When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison v. Colvin*, 759 F.3d 995, 1012-13 (9th Cir. 2014) (internal citation omitted). In conducting its review, the ALJ "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Hill v. Astrue*, 388 F.3d 1144, 1159 (9th Cir. 2012) (internal citations omitted). "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings." *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment"). "Particularly in a case where the medical opinions of the physicians differ so markedly from the ALJ's[,]" "it is incumbent on the ALJ to

provide detailed, reasoned, and legitimate rationales for disregarding the physicians' findings." *Embrey*, 849 F.2d at 422.

### B. The ALJ Erred in Evaluating the Medical Opinions

Plaintiff insists that the ALJ erred evaluating the medical opinions. In particular, Plaintiff maintains that the ALJ erred by: (1) giving little weight to the opinion of treating psychiatrist Dr. Ferrer; (2) giving no weight to the opinion of examining psychologist Dr. McCord; and (3) giving the greatest weight to the Agency's nonexamining psychological consultants, Drs. Shadid and Caruso-Radin.

#### *1. Treating Psychiatrist, Dr. Ferrer*

Plaintiff had been treated by Dr. Ferrer for approximately one year at the time that Dr. Ferrer completed Plaintiff's medical source statement ("2012 Report"). (AR 450, 752.) As a treating physician, therefore, the ALJ was required to provide "specific and legitimate reasons supported by substantial evidence" for discounting Dr. Ferrer's opinion. *See Lester*, 81 F.3d at 830-31. Here, the ALJ gave "little weight" to Dr. Ferrer's opinion, including—critically—his 2012 Report, in which Dr. Ferrer opined that Plaintiff had a poor ability in the following areas: (1) recalling detailed/complex instructions; (2) attending tasks and concentrating; (3) interacting with the public; and (4) adapting to changes in the workplace—where a finding of "poor" means the individual cannot usefully perform or sustain the activity. (AR 36, 449-50.) The ALJ offered two reasons for doing so. First, the ALJ found that Dr. Ferrer's October 2012 Report was inconsistent with his October 2011 Mental Status Examination ("2011 Report") where Dr. Ferrer found that Plaintiff could perform serial sevens and could spell "WORLD" forwards and backwards. (AR 36, 469.) Second, the ALJ found that Dr. Ferrer's October 2012 Report finding that Plaintiff was "not able to do even simple things at home" was inconsistent with Plaintiff's statements in an *undated* Agency function report, based on which the ALJ concluded that Plaintiff can "prepare meals…drive a car and go out alone, and…shop for food in stores every two weeks for up to 2

hours."[6]  (*Id.*, 329-36.)  The ALJ's evaluation of Dr. Ferrer's opinion was not supported by substantial evidence.

### i. The 2011 and 2012 Reports are not Inconsistent

First, the ALJ erred in discounting Dr. Ferrer's treating opinion by determining that the October 2011 report and the October 2012 report are inconsistent.  They are not.  There is no inconsistency between the ability to spell WORLD backwards or count by serial sevens and—as Dr. Ferrer would opine one year later—Plaintiff's "poor" ability to *sustain concentration and task persistence* throughout a "regular (40 hour) work setting."  Moreover, the ALJ wholly disregarded Dr. Ferrer's contemporaneous October 2011 finding that Plaintiff's concentration was "impaired"—which was clearly indicated in the relevant part of the same report.  (AR 469).  *Peng See v. Comm'r of Soc. Sec. Admin.*, 500 F. App'x 676, 677 (9th Cir. 2012) (finding that where ALJ's statement as to examining doctor's opinion was "factually inaccurate," it was "therefore not a legitimate reason supported by substantial evidence.")  And indeed, "[a]n ALJ may not cherry-pick evidence to support the conclusion that a claimant is not disabled, but must consider the evidence as a whole in making a reasoned disability determination." *Williams v. Colvin*, No. ED CV 14-2146-PLA, 2015 WL 4507174, at *6 (C.D. Cal. July 23, 2015) (citing *Holohan*, 246 F.3d at 1207 (holding that an ALJ cannot selectively rely on some entries and ignore others "indicat[ing] continued, severe impairment")).  Here, the ALJ cherry-picked one finding from the 2012 Report measuring Plaintiff's ability to function throughout a 40-hour work week, and another finding from the 2011 Report, but ignored the clinical findings showing similar impairment within each.  (*Compare* AR 449-50 *with* AR 469.)  In sum, the ALJ's conclusion that the two reports are inconsistent is not supported by substantial evidence.

The Commissioner insists that the ALJ properly rejected Dr. Ferrer's opinion because it was inconsistent with the record as a whole and cites to numerous examples from the record which would support the ALJ's conclusion.  The Court is not persuaded, and moreover, the Commissioner cannot on appeal supplant the reasons given by the ALJ.  *See Burrell v. Colvin*, 775

---

[6] The Agency function report at-issue is dated only with Plaintiff's birthday.  (AR 336.)

F.3d 1133, 1138 (9th Cir. 2014) (rejecting the government's attempt to identify other alleged inconsistencies between because "the ALJ did not identify those inconsistencies."); *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("We are constrained to review the reasons the ALJ asserts.").

### ii. Plaintiff's Undated Function Report is not Inconsistent with the 2012 Report

The ALJ likewise erred in discounting Dr. Ferrer's treating opinion for the reason that an undated Agency function report was inconsistent with the 2012 Report. (AR 36, 329-36, 449.) The ALJ concluded: "Dr. Ferrer's statement that the [Plaintiff] is unable to do even simple things at home is inconsistent with the [Plaintiff's] own report that she was able to prepare meals, was able to drive a car and go out alone, and was able to shop for food in stores every two weeks for up to two hours." (AR 36.) This reason is not supported by substantial evidence.

First, regardless of whether the undated Agency function report was prepared before or after Dr. Ferrer's 2012 Report, that Plaintiff's symptoms are subject to fluctuations in severity is part and parcel of her impairments. Since Plaintiff was receiving psychiatric treatment throughout this period, the ALJ erred in failing to account for this fundamental aspect of mental illness. The Ninth Circuit has said:

> As we have emphasized while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*See Garrison*, 759 F.3d at 1017 (internal citations omitted).

Second, there is no inconsistency between the 2012 Report and the undated Agency function report. Dr. Ferrer's 2012 Report did not opine that Plaintiff could *never* complete simple tasks around the house, nor did the Agency report assert that Plaintiff could *always* complete such tasks. Rather, the function report includes statements from Plaintiff in which she substantially qualifies her ability to perform the activities cited by the ALJ. Indeed, Plaintiff stated in her function report that when she is "low," the house is "trashed" because she "can't do anything."

(AR 331.)  Similarly, Plaintiff's description of her routine provided that "the kids make dinner" and "help clean, cook, and feed the pets," because when "low [Plaintiff] can't do much."  (AR 330.)  And when Plaintiff must cook at such times, she heats up ready-made lasagna, or—if "preparing meals" for herself only—will eat only a protein bar or cereal.  (AR 331.)  These statements consistently suggest impairment in Plaintiff's ability to regularly perform simple household activities and thus are not inconsistent the 2012 Report assessing Plaintiff's ability to perform throughout a 40-hour work week.  Accordingly, the ALJ erred by mischaracterizing the function report and disregarding statements tending to demonstrate impairment.  *See Garrison*, 759 F.3d at 1015-16 (ALJ erred in mischaracterizing testimony as inconsistent with reported daily activities such as "preparing meals" and "cleaning her room" because plaintiff "repeatedly emphasized that in performing many daily tasks...she was heavily assisted").

The Commissioner's arguments to the contrary are unavailing.  The Commissioner insists that Plaintiff's reports to Dr. Renfro in July 2011 demonstrate that she cared for herself, did laundry and dishes, paid bills, and could go to the ocean and play with her dogs.  (AR 441).  But Plaintiff *also* told Dr. Renfro that she wakes up at 10:30 a.m. yet naps daily from 1:30 or 2:00 p.m. until 5:00 p.m.—thus any chores or activities undertaken by Plaintiff generally result in her napping more than three hours afterwards.  "[I]mpairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  *Garrison*, 759 F.3d at 1016; *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication.")  In sum, the ALJ erred by cherry-picking the records of Dr. Ferrer's treatment and by mischaracterizing Plaintiff's function report.  Accordingly, the ALJ did not provide legitimate reasons supported by substantial evidence for discounting Dr. Ferrer's treating opinion.

### 2. Examining Psychologist, Dr. McCord

Plaintiff was examined by Dr. McCord in April 2015 upon the ALJ's request.  (AR 717-24.)  This psychological examination and accompanying medical source statement was completed

between the first and second administrative hearings, but over three months before the ALJ's written opinion, and nearly two years after Plaintiff's last insured date. Dr. McCord opined, critically, that Plaintiff "would likely need constant reminders" to recall verbal details. (AR 721-22.) Dr. McCord further opined that Plaintiff had: (1) no impairment in understanding and carrying out simple instructions; (2) a mild impairment in attending to usual work situations; and (3) a moderate impairment in concentration, persistence, and pace. (AR 720.) The ALJ rejected Dr. McCord's opinion for two reasons. First, the ALJ determined that Dr. McCord "[did] not appear to have reviewed [Plaintiff's] treatment records." (AR 36.) Second, the ALJ determined that Dr. McCord's opinion was not credible because "he examined [Plaintiff] almost two years after the date last insured." (*Id*.) The ALJ erred in his evaluation of Dr. McCord's opinion.

### *i. Dr. McCord Read Some of Plaintiff's Treatment Records*

First, the ALJ erred in discounting Dr. McCord's opinion on the basis that Dr. McCord did not read Plaintiff's records. The opinion of an examining doctor, like that of a treating doctor, "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *See Lester*, 81 F.3d at 830-31. The ALJ's reason is not supported by substantial evidence because Dr. McCord's report states that he reviewed at least: (1) Dr. Renfro's 2011 psychological examination; (2) a Social Security Form; and (3) a June 2011 evaluation noting, among other things, problems with "social functioning." (AR 717, 720.) In addition, Dr. McCord conducted his own clinical examination. (AR 717-23.) And to the extent that Dr. McCord did not review all of the treatment records, this was because the *Agency* elected not to send him those records; in short, Dr. McCord's failure to review a document he was not asked to review when the ALJ sent Plaintiff to him for an examination cannot be a specific and legitimate reason for discounting his opinion.

### *ii. The ALJ Erred in Discounting Dr. McCord's Findings on the Basis of Examination Date*

The ALJ likewise erred in discounting Dr. McCord's opinion on the basis of the examination date. Just as the ALJ cannot reject Dr. McCord's opinion for not considering evidence that the Agency did not provide, the ALJ cannot reject his opinion because it given after

the date of the last insured when the ALJ was the one who determined that the examination was necessary.  If the ALJ determined that the record needed to be developed to incorporate additional evidence, he needed to advance specific and legitimate reasons for rejecting that medical opinion evidence.  *See, e.g., Armstrong v. Comm'r of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998) ("If the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.") (internal quotation marks and citation omitted); 20 C.F.R. § 404.1519a(b)(4) (noting that the Agency may order a consultative examination to "try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim" including where "is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established."); SSR 83-20 ("If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation.").  The ALJ was not required to accept the opinion of Dr. McCord; however, he was not entitled to simply ignore the critical elements of Dr. McCord's findings in favor of the Agency's nonexamining consultants.  In sum, the ALJ's reasons for rejecting Dr. McCord's opinion are legally insufficient.

The Commissioner insists that there was no error because the ALJ's findings were "generally consistent" with Dr. McCord's opinion.  This argument is without merit.  While the ALJ incorporated some of Dr. McCord's findings, he rejected the critical one: that Plaintiff would require constant reminders to recall verbal details.  (AR 722.)  Because a VE testified that this limitation would make a person unemployable at unskilled jobs within the "entire world" of unskilled work, the remaining question is whether the ALJ's error was harmless.  (AR 88, 90-91.)  As discussed below, it was not.

### 3. Nonexamining Agency Psychologists, Drs. Shadid and Caruso-Radin

The ALJ accorded great weight to nonexamining Agency psychologists, Drs. Shadid and Caruso-Radin.  (AR 35.)  In October 2012, Dr. Shadid opined that Dr. Ferrer's 2012 Report was

"more restrictive than the claimant's ADL." (AR 101.)  Dr. Shadid thus found Plaintiff "partially credible" based on her purported ability to "drive and go out alone, and shop for up to two hours." (AR 101-02.)  He further noted that Dr. Ferrer's medical source statement did not mention "specific limitations to functioning." (AR 101.)  Similarly, in October 2013, Dr. Caruso-Radin reviewed Plaintiff's file pursuant to the reconsideration request.  (AR 35, 115-16, 120-22, 131.) Dr. Caruso-Radin's findings consisted of the following:  "Sum: alleging bipolar.  DLI 6/30/13. Thus current Y CE is not reasonable.  Reviewing the records from the period in question, it appears the bipolar is kept stable and MSE's are good. The evidence as a whole indicates the prior decision remains reasonable and based in the MER.  Prior decision is adopted." (AR 115-16.) The ALJ erred in according great weight to the opinions of these nonexamining Agency doctors.

First, Dr. Shadid opined that Dr. Ferrer provided no "specific limits to functioning," but this is manifestly incorrect because the 2012 Report opined that Plaintiff had *numerous* limitations.  (AR 449-50.)  Moreover, Dr. Shadid's opinion that Plaintiff could drive and shop likewise required an egregious mischaracterization of the function report.  Since Dr. Shadid's mischaracterization implicates the function report addressed above, the Court will not duplicate that discussion here.

Second, as to Dr. Caruso-Radin's opinion, it is so cursory that it is unclear how the ALJ could afford it greater weight than the far more thorough reports and clinical examinations of Plaintiff's treating and examining physicians.  The "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3));20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.")  And "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Ryan*, 528 F.3d at 1202 (citing *Lester,* 81 F.3d at 831) (emphasis in the original).  In light of the foregoing, the Court concludes that the ALJ erred in giving great weight to the opinions of nonexamining Agency psychologists Drs. Shadid and Caruso-Radin.

1    **II.    The ALJ's Evaluation of Plaintiff's Credibility**

2        **A.    Legal Standard**

3        To "determine whether a claimant's testimony regarding subjective pain or symptoms is

4    credible," an ALJ must use a "two-step analysis." *Garrison*, 759 F.3d at 1014. "First, the ALJ

5    must determine whether the claimant has presented objective medical evidence of an underlying

6    impairment which could reasonably be expected to produce the pain or other symptoms alleged."

7    *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks

8    omitted). "Second, if the claimant meets the first test, and there is no evidence of malingering, the

9    ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

10   specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks

11   omitted). The clear and convincing standard is "the most demanding required in Social Security

12   cases." *Moore v. Comm'r of the Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002). "General

13   findings are an insufficient basis to support an adverse credibility determination." *Holohan*, 246

14   F.3d at 1195, 1208 (9th Cir. 2001). Rather, the ALJ "must state which pain testimony is not

15   credible and what evidence suggests the claimant[ ][is] not credible." *Dodrill v. Shalala*, 12 F.3d

16   915, 918 (9th Cir. 1993); *see also Ghanim*, 763 F.3d 1154, 1163 (9th Cir. 2014) ("General

17   findings are insufficient; rather, the ALJ must identify what testimony is not credible and what

18   evidence undermines the claimant's complaints.") (citation omitted).

19       **B.    The ALJ Erred in Evaluating Plaintiff's Credibility**

20       Applying a two-step analysis, the ALJ found that Plaintiff's "medically determinable

21   impairments could reasonably be expected to cause the alleged symptoms." (AR 31-32.) The

22   ALJ nevertheless determined that Plaintiff's testimony regarding "the intensity, persistence, and

23   limiting effects of these symptoms are not entirely credible" for several reasons, as set forth

24   below. (AR 32.) Because Plaintiff met the first part of the test, the ALJ could only reject

25   Plaintiff's testimony as to the severity of the symptoms if presented with evidence that Plaintiff

26   was malingering, or by providing specific, clear and convincing reasons for doing so. *See*

27   *Lingenfelter*, 504 F.3d at 1036. The ALJ erred in rejecting Plaintiff's testimony regarding the

28

severity of the pain because there was no finding of malingering, and the ALJ failed to meet the demanding clear and convincing reasons standard.

The ALJ acknowledged that Plaintiff suffers from the following severe physical impairments: (1) thyroidectomy secondary to carcinoma of thyroid, status post iodine ablation; (2) cervical osteoarthritis with radiculopathy on the right; and (3) lumbar disc pain in the L4-L5 area. (AR 27-28.) The ALJ concluded that these impairments were medically determinable and "could reasonably be expected to cause the alleged symptoms." (AR 31.) He nevertheless concluded that Plaintiff was only partially credible because: (1) there were inconsistencies between her testimony at the January 2015 hearing and statements made to Dr. Keystone in November 2012, implicating Plaintiff's ability to stand, walk, sit, and (2) carry a laundry basket full of clothes; and (3) there were limited physical findings; and (4) there was no evidence of significant treatment during the insured period. (AR 36-37.) These reasons do not rise to the level of clear and convincing.

First, the ALJ erred in finding that Plaintiff's testimony at the January 2015 hearing—that she cannot stand for more than 10 minutes in one position; or walk or sit for long periods of time without a great deal of pain—contradicted a statement made to examining internist Dr. Keystone in November 2012. The ALJ pointed to a line from Dr. Keystone's report, written three years prior, for the proposition that Plaintiff can "stand for up to one hour before needing to sit briefly." (AR 36, 473-78.) But that sentence states in full: "*Standing tends to exacerbate [Plaintiff's] problem* although she can stand for up to one hour and then must sit down briefly." (AR 473) (emphasis added). And at the first hearing, Plaintiff testified that she cannot "stand for more than 10 minutes" before she needs to "shift...rub [her] back...squat to stretch [her] back out, *then ultimately end up sitting*." (AR 60) (emphasis added). She also testified that she cannot "stand, walk, or sit for long periods of time without a great deal of pain." (AR 59.) These statements are not inconsistent. The ALJ's finding amounts to improper cherry-picking as well as an egregious mischaracterization of Plaintiff's relevant statement. *Holohan*, 246 F.3d at 1207-08 (ALJ may not selectively rely on some entries and ignore others "indicat[ing] continued, severe impairment"); *Garrison*, 759 F.3d at 1016 ("We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments

that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day.").

Second, the ALJ erred in finding it a "significant inconsistency" that Plaintiff testified at the first administrative hearing that she is "[r]eally not even able to carry a laundry basket that's full of clothes" without having "somebody do it for [her]" but told Dr. Renfro in July 2011 that she does laundry as part of her daily routine. (AR 36, 59, 441.) However, Plaintiff did not report to Dr. Renfro that she carries full baskets of laundry but that she "*puts on* a load of laundry." (AR 441) (emphasis added). And the record is replete with examples of Plaintiff stating that she struggles with household chores. For example, she told Dr. Ali in July 2011 that while she does "all activities," doing so requires "taking multiple breaks." (AR 444.) And she told Dr. Glantz in April 2015 that she does "laundry with help." (AR 712.) Her son, Jesse Lopez, submitted a statement attesting that "[a]t this point [Plaintiff] can't even carry a basket of laundry to her room if it's a full basket." (AR 364.) The Ninth Circuit has "held consistently that, activities such as light household chores, cooking meals, and grocery shopping are activities that do not necessarily translate to the work environment." *Saunders*, 433 F. App'x at 533-34; *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (holding that grocery shopping, driving a car, and limited walking for exercise are not inconsistent with disability); *Reddick v. Chater*, 157 F.3d 715, 723 n.1 (9th Cir.1998) (limited cooking, cleaning, and shopping are not indicative of an ability to engage in sustained work activity). In sum, Plaintiff's statements are consistent, and in any event are not inconsistent with her allegations of disability for the reasons set forth by the ALJ.

Third, the ALJ erred in discounting Plaintiff's allegations of disabling neck and back pain for the reason that the record showed "limited physical examination findings." (AR 36-37.) Indeed, the ALJ found that Plaintiff suffers severe impairments including: (1) cervical osteoarthritis with radiculopathy on the right; and (2) lumbar disc pain in the L4-L5 area. (AR 27-28.) To find these impairments medically-determinable and "severe" yet unpersuasive for purposes of evaluating Plaintiff's testimony does not rise to the level of clear and convincing. *Schmasow v. Astrue*, 403 F. App'x 266, 267 (9th Cir. 2010) (ALJ improperly discredited plaintiff's testimony regarding ability to walk and stand for long period of time and thus did not

provide "clear and convincing" reason to discount that testimony). And further, the ALJ did not account for the combined effects of Plaintiff's severe impairments. *See* 42 U.S.C. § 423(d)(2)(B) ("In determining whether an individual's ... impairments are of a sufficient medical severity that such ... impairments could be the basis of eligibility under this section, the [Commissioner] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")

Fourth, the ALJ erred in discounting Plaintiff's testimony for lack of "significant treatment" for neck and back pain during the insured period. (AR 36-37.) As a general matter, an ALJ may rely on "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" in evaluating a claimant's credibility; a failure to "assert a good reason for not seeking treatment, or a finding by the ALJ that the preferred reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *See Molina*, 674 F.3d at 1113. But here, Plaintiff testified that she takes Advil for her pain rather than controlled medications because she lives with her four children, one of whom has been hospitalized for self-harm. (AR 61-62); *Garrison*, 759 F.3d at 1015 n.19 (ALJ erred in unfavorable credibility finding where plaintiff "could not afford" course of physical therapy treatment and no record evidence showed that physical therapy would have alleviated her pain such that her credibility could be discounted for failing to undergo treatment); *Smolen,* 80 F.3d at 1284 ("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so.") And there is no record evidence suggesting that Plaintiff was offered and rejected a course of pain-alleviating treatment, nor does the ALJ expressly make such a finding. *See Esparza v. Colvin*, 631 F. App'x 460, 462 (9th Cir. 2015) (rejecting noncompliance with a treatment regimen as a basis for an adverse credibility finding where the ALJ did not find that "[the plaintiff] lacked good cause for failing to comply or that complying would have allowed him to return to work.") Indeed, Plaintiff testified to receiving trigger point injections in her shoulders which failed to reduce her pain. (AR 61-62.) She also testified to seeing a chiropractor, which the ALJ's opinion did not address. (AR 61.) Indeed, Dr. Keystone's report provides that "[Plaintiff] sees a chiropractor and has seen some relief from that." (AR 474.)

Such evidence was submitted with Plaintiff's appeal and was incorporated by the Appeals Council into the administrative record. (AR 725-51); *Revels v. Berryhill*, 874 F.3d 648, 657 (9th Cir. 2017) ("We may consider as part of the record on review the medical records [] that were submitted to the Appeals Council.") (citing *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012)). In sum, the ALJ erred in failing to offer reasons that satisfy the "demanding" "clear and convincing standard." *Garrison*, 759 F.3d at 1013.

## III.     The ALJ's Evaluation of Lay Statements

### A.     Legal Standard

Lay testimony as to symptoms is "competent evidence that an ALJ must take into account unless the ALJ expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Tobeler v. Colvin*, 749 F.3d 830, 832-34 (9th Cir. 2014). Disregarding competent lay witness testimony without comment, therefore, constitutes legal error. *Id.* Specifically, lay witness testimony as to how an impairment affects ability to work is competent evidence and therefore cannot be disregarded without comment. *Id.* But where "the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114.

### B.     The ALJ Erred in Evaluating the Lay Statements

The ALJ rejected the statements of Plaintiff's husband and children on the basis that those statements "generally mirror" Plaintiff's statements and are "unsupported by a preponderance of the medical evidence." (AR 37.) The lay statements at-issue do not "mirror" Plaintiff's subjective complaints but rather encompass a range of longitudinal observations concerning Plaintiff's impairments. (AR 360-73); *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (lay testimony as to claimant's symptoms and effect on ability to work is competent evidence); *Dodrill*, 12 F.3d at 918-19 ("Although eyewitnesses have to rely to some extent on communications with the claimant in ascertaining whether she is disabled or malingering, we have held that friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to her condition.") Here, lay observations about Plaintiff's symptoms include, among many others: (1) "I hear her calling out and when I get to her I have to help her get off the floor

and into bed" (AR 360); and (2) "She can't even carry a basket of laundry to her room if it's a full load" (364); and (3) "I've been with her when she's in so much pain she cries" (372). Such statements are consistent with Plaintiff's own reports and are not bare recitations of Plaintiff's alleged impairments. *Schneider v. Comm'r, Soc. Sec. Admin*, 223 F.3d 968, 974-75 (9th Cir. 2000) (ALJ erred in failing to consider lay letters in evaluating severity of claimant's functional limitations). While the ALJ was not required to accept the lay statements, he was not entitled to disregard them without providing a germane reason for doing so. *Molina*, 674 F.3d at 1114.

Second, even if the lay statements lack support in the medical record, this is not a germane reason to reject them. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (the ALJ could not "discredit [the witness'] lay testimony as not supported by medical evidence in the record."). Indeed, "[t]he fact that lay testimony and third-party function reports may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing." *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017) (citing *Smolen*, 80 F.3d at 1289). Thus, "[a] lack of support from medical records is not a germane reason to give "little weight" to those observations." *Id*. In sum, the ALJ erred by failing to provide germane reasons to reject the lay statements. The Court turns next to the question of whether the ALJ's errors were harmless.

## IV. Harmless Error

Even if an ALJ commits legal error, the court will "uphold the decision where that error is harmless." *Treichler*, 775 F.3d at 1099. Harmless error is that which is "inconsequential to the ultimate nondisability determination" or if despite the error, "the agency's path may reasonably be discerned." *Id*. The ALJ's various errors were neither nonprejudicial nor inconsequential to the ultimate disability determination. *See Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) (an error is harmless if it is "inconsequential to the ultimate nondisability determination"). Accordingly, the Court cannot say that the ALJ's errors in evaluating the medical evidence would not have altered the ALJ's RFC determination and thus the ultimate disability determination. The same is true with respect to the ALJ's credibility findings as to Plaintiff and the lay statements. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) ("Where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a

reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."); *see Lingenfelter*, 504 F.3d at 1035 (ALJ failed to provide clear and convincing reasons to reject plaintiff's testimony and was thus required to include those limitations in RFC assessment). In sum, ALJ's errors are not harmless.

## V.    Remand

Plaintiff asks the Court to remand for immediate benefits under the credit-as-true rule. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004). However, a court may remand for an immediate award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014). Each part of this three-part standard must be satisfied for the court to remand for an award of benefits, *id.*, and "[i]t is the 'unusual case' that meets this standard." *Williams v. Colvin*, No. 12-cv-6179-YGR, 2014 WL 957025, at *14 (N.D. Cal. Mar. 6, 2014) (quoting *Benecke*, 379 F.3d at 595); *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) ("where [...] an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency") (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014)). It is only "rare circumstances that result in a direct award of benefits" and "only when the record clearly contradicted an ALJ's conclusory findings and no substantial evidence within the record supported the reasons provided by the ALJ for denial of benefits." *Leon*, 880 F.3d at 1047.

Such rare circumstances exist here. As to the first prong, the record is fully developed. It spans hundreds of pages and contains treatment notes from dozens of doctor visits during the insured period as well as medical history dating back as far as 1999, when Plaintiff sustained trauma to her neck and back in a car accident. And although the ALJ insisted Plaintiff underwent

no significant treatment during the relevant period, the record plainly describes numerous attempts to diagnose and treat Plaintiff's various impairments. The record also reflects Plaintiff's testimony before the ALJ and her responses to questionnaires about her physical and mental limitations, and in addition includes lay statements containing the personal observations of family members, all of which corroborate the disabling nature of Plaintiff's impairments. And a VE testified that an individual with Plaintiff's limitations, as determined by longtime treating psychiatrist Dr. Ferrer and separately, examining psychologist Dr. McCord, would be unemployable.[7]

The second and third prongs of the credit-as-true standard are also satisfied. The ALJ failed to provide legally sufficient reasons for rejecting the informed medical opinions of Plaintiff's treating psychiatrist as well as that of the examining psychologist, and instead improperly substituted his judgment for that of those physicians. When credited as true, Dr. Ferrer's opinion establishes that Plaintiff is disabled, because a VE testified that somebody would the limitations found by Dr. Ferrer would be unemployable. (AR 77.) Likewise, when credited as true, Dr. McCord's opinion establishes that Plaintiff is disabled based on the VE's testimony that someone with those limitations would be unable to work. (AR 78.) Taken jointly or severally, these opinions "establis[h] that [Plaintiff] is entitled to benefits." *See Garrison*, 759 F.3d at, 1022 n.28; *Lingenfelter*, 504 F.3d at 1041 n.12 (9th Cir. 2007); *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015) ("The touchstone for an award of benefits is the existence of a disability, not the agency's legal error."); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017) (applying credit-as-true where: (1) ALJ failed to provide legally sufficient reasons to discredit treating doctor's opinion; (2) treating opinion was supported by evidence; (3) VE testified that an individual of similar status and impairment was unable to work full-time; and (4) plaintiff's testimony was not inconsistent with the record). The Commissioner insists that remand for an award of benefits is

---

[7] There is no conflict between the relevant critical findings of Drs. Ferrer and McCord. While Dr. Ferrer opined, after a year of treating Plaintiff, that she was unable to attend and concentrate at tasks throughout a full-time work week, Dr. McCord opined that Plaintiff would need constant reminders to recall verbal details to do so. (AR 449, 722.) In both cases, a VE determined that an individual so impaired would be unable to maintain unskilled employment. (AR 91-22.)

improper because the record contains "conflicting evidence" regarding Plaintiff's alleged disability—pointing in particular to a physical exam and citing the very same function report that was mischaracterized in relevant part, as discussed above. (AR 446.) The Court is not persuaded. "[T]he credit-as-true rule foreclose[s] the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a useful purpose under the first part of credit-as-true analysis." *See Garrison*, 759 F.3d at 1021 (citing *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir.2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.") In sum, there is no serious doubt based on the Court's evaluation of the record as a whole that Plaintiff is disabled within the meaning of the Social Security Act.

### CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment (Dkt. No. 14) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 17). The Court VACATES the ALJ's final decision and REMANDS for an award of benefits.

This Order terminates Docket Nos. 14 and 17.

**IT IS SO ORDERED.**

Dated: April 4, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge